# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| ECC CENTCOM Constructors, LLC,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | Civil Action No. 21-1204 C |

## COMPLAINT

Plaintiff, ECC CENTCOM Constructors, LLC (hereafter "ECC CENTCOM"), by the undersigned counsel, alleges as follows for its Complaint:

1. ECC CENTCOM is organized under the laws of the State of Delaware.

2. Defendant is the United States of America ("Defendant"), acting by and through the Middle East District ("MED") of the U.S. Army Corps of Engineers ("USACE").

3. ECC CENTCOM submitted its certified claim on September 20, 2017, in the amount of $522,368.99 for additional costs for Defense Base Act (DBA) workers compensation insurance premiums related to work performed on Contract No. W912ER-11-D-0010, Task Order 0002, for design and construction of the Bachelor Enlisted Quarters (BEQ), Manama, Bahrain.

4. ECC CENTCOM submitted its revised certified claim on October 12, 2017, to the new amount of $540,797.07 for additional costs for DBA insurance premiums.

5. A USACE Contracting Officer from the MED never issued a final decision on ECC CENTCOM's certified claim or revised certified claim for additional costs for DBA insurance premiums.

6. This Court has jurisdiction over the deemed denial of the DBA insurance premium claim pursuant to 28 U.S.C. § 1491 and the Contract Disputes Act of 1978, ("CDA"), 41 U.S.C. §601 *et seq.*

7. ECC CENTCOM submitted its certified claim on January 27, 2020, in the amount of $832,225.24 for additional costs for improperly assessed liquidated damages, for an electrical energization delay, for modification of the reverse osmosis irrigation system (ROIS), and for security badging delays, all related to work performed on Contract No. W912ER-11-D-0010, Task Order 0002, for design and construction of the BEQ, Manama, Bahrain.

8. A USACE Contracting Officer from the MED never issued a final decision on ECCI's January 27, 2020 certified claim for additional costs for improperly assessed liquidated damages, for an energization delay, for modification of the reverse osmosis irrigation system, and for security badging delays.

9. This Court has jurisdiction over the deemed denial of the January 27, 2020 certified claim pursuant to 28 U.S.C. § 1491 and the Contract Disputes Act of 1978, ("CDA"), 41 U.S.C. §601 *et seq.*

## CONTRACT BACKGROUND

10. USACE awarded ECC CENTCOM Contract No. W912ER-11-D-0010, a Multiple Award Task Order Contract ("the MATOC"), on June 16, 2011, for general construction and construction related services, including design-build services.

11. On September 28, 2012, USACE awarded ECC CENTCOM Contract No. W912-ER-11-D-0010, Task Order 0002 ("Task Order 0002"), in the amount of $42,184,662.00, for the design and construction of the BEQ on the waterfront in Manama, Bahrain.

12. The Notice to Proceed with work was acknowledged by ECC CENTCOM on January 6, 2013.

13. The original Contract had a period of performance of 710 calendar days, from the date that NTP was acknowledged, establishing an original Contract Completion Date of January 16, 2015.

14. There were eight modifications of the contract, which extended the Contract Completion Date by four (4) calendar days to January 20, 2015, and modified the contract price to $45,530,207.00.

15. The awarded Task Order 0002 was for a firm-fixed price lump sum bid price that was made up of a series of Contract Line Item Numbers (CLINs) for the various features of the project.

16. The awarded Task Order 00002 included an RFP Proposal Schedule with a group of specific CLINs that were required to have specific bid costs.

17. CLIN No. 0001 AG was for Defense Base Act (DBA) that ECC CENTCOM bid as a Lump Sum, Firm Fixed Price in the amount of $286,647.01.

## Count I – Claim for Unpaid DBA Premiums

18. ECC CENTCOM repeats the assertions in paragraphs 1-17 above as if fully stated herein.

19. CLIN No. 0001 AG provided that "The amount listed by the offeror on this CLIN is the estimated DBA insurance premium."

20. CLIN No. 0001 AG further provided that "The actual amount paid by the Government under this CLIN will be based on the amount of the Rutherford [CNA] invoice submitted by the offeror after contract award."

3

21. Rutherford [CNA] was the insurance provider that ECC CENTCOM was required to use to provide DBA insurance on Task Order 0002.

22. Task Order 0002 included FAR Contract Clause 52.228-3, WORKERS COMPENSATION INSURANCE (DEFENSE BASE ACT)(APR 1984), which required ECC CENTCOM to obtain and maintain DBA insurance during performance, and to require all of its subcontractors to likewise obtain and maintain DBA insurance during performance.

23. CLIN No. 0001 AG further provided that "In the event of recalculation of the premium by CNA [ECC CENTCOM's DBA Insurance carrier] on actual payroll amounts, the Contracting Officer will adjust this CLIN by contract modification to reflect actual premium amounts paid."

24. ECC CENTCOM complied with the terms of Task Order 0002 and obtained and maintained DBA insurance throughout performance, and had its subcontractors likewise maintain DBA insurance throughout performance.

25. During the course of performance, USACE paid ECC CENTCOM $286,647.01 for DBA premiums, the estimated DBA insurance premiums that ECC CENTCOM included in CLIN No. 001 AG, plus an additional $18,881.00 in DBA premiums for work added by modifications, for a total payment of $305,528.01 for DBA premiums.

26. During the course of performance of Task Order 0002, ECC CENTCOM and its subcontractors paid a total of $846,325.08 in DBA premiums.

27. ECC CENTCOM presented to USACE the invoices for actual DBA premiums paid to CNA throughout performance of Task Order 0002.

28. USACE failed to follow the terms of Task Order 0002, in that it failed to pay ECC CENTCOM "the amount of the Rutherford [CNA] invoice submitted by the offeror after contract award."

29. Modification P0005 modified the DBA requirements of Task Order 0002, by removing the mandatory purchase of DBA insurance exclusively from the insurance carrier Continental Insurance Company (CNA) and its broker Rutherford, and allowing DBA insurance to be purchased by ECC CENTCOM from six different insurance carriers, including CNA. This Modification reflected a Department of Defense (DOD) structural change in the DBA Insurance program.

30. Modification P0005 did not change any other terms of Task Order 0002, as it noted that "All other Terms and Conditions Remain Unchanged."

Wherefore, ECC CENTCOM is entitled to payment of $540,797.07 in unpaid DBA premiums for invoices that were presented to USACE, plus interest under the Contract Disputes Act (CDA).

## Count II – Claim for Improper Liquidated Damages Assessment

31. ECC CENTCOM repeats the assertions in paragraphs 1-30 above as if fully stated herein.

32. Task Order 0002 included a liquidated damages clause providing for the assessment of $2,397.00 per day for contract completion beyond the required date.

33. Based upon the original contract completion date, and all modifications issued, Task Order 0002 had a required contract completion date of January 21, 2015.

34. ECC CENTCOM completed commissioning of the Task Order 0002 project and turned the project over to the Government's Base Housing Authority for beneficial occupancy and use on August 23, 2016.

35. The Task Order 0002 project was substantially complete as of August 23, 2016.

36. On October 6, 2016, USACE sent ECC CENTCOM a letter stating that substantial completion occurred on September 15, 2016.

37. USACE chose to impose liquidated damages through September 30, 2016.

38. Based upon the August 23, 2016 date of substantial completion and beneficial occupancy, and without considering any other claims of delay on Task Order 0002, liquidated damages should have ended on August 23, 2016.

Wherefore, based upon the date of actual substantial completion of Task Order 0002, ECC CENTCOM is entitled to payment of $91,086.00 for 38 days of improperly assessed liquidated damages.

## Count III – Electrical Energization Delay Claim

39. ECC CENTCOM repeats the assertions in paragraphs 1-38 above as if fully stated herein.

40. Task Order 0002 included Specification 26 08 00, Part 3, Section 3.3, which had a requirement for placing equipment in service.

41. Specification 26 08 00, Part 3, Section 3.3 detailed the requirements for placing equipment in service, but it did not include a requirement for National Institute for Certification in Engineering Technology (NICET) certification.

42. ECC CENTCOM was ready for energization of the equipment on January 6, 2016, and scheduled energization for that date.

43. USACE decided that prior to energization, the equipment must have NICET certification, which had to be performed by an electrician who was NICET certified.

44. As Task Order 0002 did not require NICET certification, ECC CENTCOM did not plan to use an electrician who was NICET certified to perform the equipment energization.

45. USACE prevented ECC CENTCOM from performing the equipment energization on its planned date of January 6, 2016, until ECC CENTCOM could find a NICET certified electrician to perform this work.

46. ECC CENTCOM located a Master Electrician with NICET certification as quickly as possible, and was ready to perform the equipment energization, but was further delayed when USACE's on site representative decided that the work could not be performed because the USACE representative alleged that the Master Electrician did not have the proper Personal Protective Equipment (PPE).

47. Task Order 0002 did not have specific requirements for PPE for the equipment energization.

48. After delaying the equipment energization process due to use of allegedly improper PPE by the Master Electrician, USACE then allowed the equipment energization process to proceed with the same PPE that had originally been planned by the Master Electrician.

49. ECC CENTCOM was able to finally perform the equipment energization on January 22, 2016, 16 days later than scheduled, and 16 days later than when the work should have been performed.

50. ECC CENTCOM performed a Time Impact Analysis (TIA) to determine if the delay in performing the equipment energization affected the critical path for the project and the completion date.

51.     ECC CENTCOM's TIA demonstrated that the project was delayed by 16 days because of the unnecessary USACE delay to the equipment energization.

Wherefore, ECC CENTCOM is entitled to $61,007.36 in delay costs for the 16 days of delay, and a time extension of 16 days that eliminates the additional sum of $38,352.00 of liquidated damages.

### Count IV – Reverse Osmosis Costs Caused by Modification 06

52.     ECC CENTCOM repeats the assertions in paragraphs 1-51 above as if fully stated herein.

53.     On October 3, 2013, USACE issued a Request for Proposal (RFP) for the redesign of the Irrigation Water System.

54.     The RFP required design and construction of an irrigation water system consisting of a piped collection system for the reverse osmosis (RO) reject water from the existing Consolidated Utility Building, and the condensate generated by the air handler.  The irrigation water system was to connect to the existing 50,000-gallon ground level water storage tank near the northern corner of the base.  The collection system was to operate by gravity flow to the maximum extent possible, and use at least one lift station to pump the RO reject water.

55.     On February 3, 2014, ECC CENTCOM submitted its response to the RFP for the Irrigation Water System, proposing direct costs for design and construction of the irrigation water system at a cost of $384,593.00.

56.     ECC CENTCOM's proposal included its costs, as well as design costs for its Designer of Record (DOR) Michael Baker, and its construction subcontractor Kooheji.

57. ECC CENTCOM's proposal included a Site Layout Plan that provided certain "Assumptions and Qualifications," including that "Relocation of existing utilities encountered during this work is excluded."

58. On February 25, 2014, the parties signed bilateral Modification No. 06, requiring the design and installation of a reverse osmosis reject water and air handler condensate to provide the required irrigation water by using the existing 50,000-gallon Irrigation/Wash Water holding tank on the base.

59. Modification No. 06 provided that the modification was issued "in accordance with the RFP dated 03 October 2013 and the contractor's revised proposal dated 03 February 2014."

60. Based upon the language in Modification No. 06 and ECC CENTCOM's February 3, 2014 proposal, relocation of any existing utilities was excluded from the scope of the modification.

61. During the course of construction, ECC CENTCOM encountered multiple, unknown, latent subsurface utility conflicts for the pipe outside of the Common Utility Building.

62. These unknown, latent subsurface utility conflicts for the pipe outside of the Common Utility Building were a change to the terms of Task Order 0002 and Modification No. 06.

63. These unknown, latent subsurface utility conflicts for the pipe outside of the Common Utility Building were a Type I and Type II differing site condition.

64. At the time the parties signed bilateral Modification No. 06, they were under the mutually mistaken understanding that there were no underground utilities that would cause conflicts with the design for the ROIS required by the modification.

9

65. These unknown, latent subsurface utility conflicts for the pipe outside of the Common Utility Building also represented a mutual mistake of fact by the parties, related to the work required by Modification No. 06.

66. On October 21, 2015, ECC CENTCOM documented the unknown latent sub-surface utility conflicts and notified USACE of the differing site conditions.

67. On October 28, 2015, USACE suspended all work related to the reverse osmosis irrigation system (ROIS), with instructions to eliminate the utility conflicts, including eliminating connection of city water to the ROIS.

68. ECC CENTCOM's Designer of Record (DOR) proceeded with the re-design as required by the unknown subsurface utility conflicts, and submitted the design revisions to USACE.

69. ECC CENTCOM incurred additional direct design costs of $39,531.60 for redesign of the ROIS due to the unknown subsurface utility conflicts, plus G & A (8.71%) and Fee (7%) markups.

70. Modification No. 06 did not provide for or address the need for a redesign of the ROIS due to the unknown subsurface utility conflicts, as the parties were unaware at the time the modification was executed that redesign of the ROIS would be necessary.

71. ECC CENTCOM's redesign of the ROIS caused by the unknown subsurface utility conflicts required the addition of an extra lift station to transfer water to the next point of connection.

72. ECC CENTCOM incurred direct costs of $188,000.00, plus G & A (8.71%) and Fee (7%) markups for construction of the additional lift station.

73. ECC CENTCOM's redesign of the ROIS caused by the unknown subsurface utility conflicts required the addition of a tank cover for the ROIS tank.

74. Modification No. 06 did not provide for or address the need for a tank cover for the ROIS tank to assure the system worked properly, as the parties were unaware at the time the modification was executed that a ROIS tank cover would be necessary.

75. ECC CENTCOM incurred direct costs of $43,000.00, plus G & A (8.71%) and Fee (7%) markups for the addition of a tank cover for the ROIS tank.

76. ECCI's redesign of the ROIS caused by the unknown subsurface utility conflicts also required synchronization of all lift stations to assure the system worked properly.

77. Modification No. 06 did not provide for or address the need for synchronization of all lift stations to assure the system worked properly, as the parties were unaware at the time the modification was executed that multiple lift stations would be necessary.

78. ECC CENTCOM incurred direct costs of $42,400.00 plus G & A (8.71%) and Fee (7%) markups for providing synchronization of all lift stations.

79. Because of the redesign and associated delays to the ROIS due to the unknown subsurface utility conflicts, ECC CENTCOM was required to provide temporary water from commercial sources, including temporary water to meet the seasonal requirement for planting trees and shrubs.

80. Modification No. 06 did not provide for or address the need for temporary water from commercial sources, as the parties were unaware at the time the modification was executed that any temporary water would be necessary.

81. ECC CENTCOM incurred direct costs of $17,788.75 plus G & A (8.71%) and Fee (7%) markups for temporary water necessary to maintain landscaping while the redesigned ROIS was being built.

82. As a direct result of encountering unknown subsurface utility conflicts and the associated design and construction delays, ECC CENTCOM incurred 35 calendar days of delay to the critical path for Task Order 0002.

83. ECC CENTCOM incurred additional costs of $136,875.48 for additional general conditions for the 35 calendar days of delay.

Wherefore, ECC CENTCOM is entitled to $509,317.59 including direct costs and G & A and Fee markups in additional costs, plus $136,875.48 in additional delay costs for 35 calendar days of delay to completion of the project, due to the unknown subsurface utility conflicts encountered during the execution of Modification No. 06, which were a change, a mutual mistake of fact, and a Type I and Type II differing site condition.

## Count V – Claim for Changes to Badging Process

84. ECC CENTCOM repeats the assertions in paragraphs 1-83 above as if fully stated herein.

85. Task Order 0002 was performed on a US CENTCOM military installation in Manama, Bahrain.

86. Under the terms of Task Order 0002, ECC CENTCOM was required to follow the US CENTCOM INSTALLATION ACCESS APPLICATION process to obtain site access for all of its workers who performed on-site work.

87. Specific steps were listed in Task Order 0002 for base access, including having all employees go through a Base Screening Process to obtain a badge, displaying a badge at all

times while on the project, and wearing coveralls of a distinct color for the prime and subcontractor.

88. Task Order 0002 specified that employees had to be identified for badging at least 60 days prior to requiring site access.

89. Task Order 0002 specified that workers should expect 45-60 minutes of waiting time for all workers and equipment when entering the Base Security Area.

90. ECC CENTCOM reasonably relied upon the provisions of Task Order 0002 in preparing its bid, bidding costs for the cost of going through the Base Screening Process as specified.

91. During the course of performance, USACE imposed changes to the Base Screening Process that were not listed in Task Order 0002, including but not limited to requiring ECC CENTCOM to obtain new badges for employees who were already badged ("rebadging") on multiple occasions.

92. USACE's requirement for rebadging of employees, a process not included in Task Order 0002, was a constructive change.

93. As a direct result of USACE's requirement for rebadging on multiple occasions, ECC CENTCOM was greatly limited in the number of workers on site, causing significant delays to performance of Task Order 0002.

94. During the course of performance, USACE imposed additional changes to the Base Screening Process that were not listed in Task Order 0002, including but not limited to refusing to process more than 15 rebadging applications per week, when hundreds of applications were pending at any given time.

95. USACE's decision to process no more than 15 rebadging applications per week, a process not included in Task Order 0002, was a constructive change.

96. ECC CENTCOM provided multiple and immediate notices to USACE that its actions related to the Base Screening Process were constructive changes to Task Order 0002.

97. As a direct result of USACE's refusal to process more than 15 rebadging applications per week, ECC CENTCOM was greatly limited in the number of workers on site, causing significant delays to performance of Task Order 0002.

98. ECC CENTCOM performed a TIA that determined there were 21 days of delay associated with the constructive changes to the Base Screening Process.

99. As a direct result of USACE's constructive changes to the Base Screening Process, ECC CENTCOM was delayed 21 days in completion of the Task Order 0002 project, causing $82,125.29 in extended general conditions costs.

100. As a direct result of the constructive changes to the Base Screening Process, ECC CENTCOM was delayed 21 days and was entitled to a 21-day time extension that would eliminate the associated liquidated damages.

Wherefore, ECC CENTCOM is entitled to $82,125.29 for 21 days of delay costs and $50,337.00 in previously charged liquidated damages, for a total of $132,462.29 due to the Base Screening Process constructive changes.

## **CONCLUSION AND DEMAND FOR RELIEF**

WHEREFORE, Plaintiff requests the Court to find that ECC CENTCOM is entitled to a judgment of $540,797.07 for DBA premiums paid ECC CENTCOM, but not reimbursed for COUNT I; $91,086.00 for 38 days of improperly assessed Liquidated Damages for COUNT II; $99,359.36 for 16 days of delay due to the electrical energization process for COUNT III;

$509,317.59 for unpaid direct costs ($372,532.59) and delay costs ($136,785.00) for a change, a mutual mistake, and differing site conditions due to unknown subsurface utilities encountered during performance of ROIS Modification No. 06 for COUNT IV; and $132,462.29 for 21 days of delay caused by constructive changes to the Base Screening Process for COUNT V; and that ECC CENTCOM is entitled to interest and costs, as allowed by law, and such other relief as the Court deems appropriate.

Dated: April 14, 2021

/s/ R. Dale Holmes, Esq.
R. Dale Holmes, Esquire
Cohen Seglias Pallas Greenhall
& Furman PC
1600 Market Street, 32nd Floor
Philadelphia, PA 19103
Tel:   215-564-1700
Fax:   267-238-4456
Email: dholmes@cohenseglias.com

Counsel for ECC CENTCOM

Co-Counsel:
Casey McKinnon, Esquire
Michael H. Payne, Esquire
Cohen Seglias Pallas Greenhall & Furman PC